UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| CONNIE ENDSLEY, | |
| Plaintiff, | Case No. 1:24-cv-00057 |
| v. | Judge Aleta A. Trauger |
| | Magistrate Judge Alistair E. Newbern |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

To:     The Honorable Aleta A. Trauger, District Judge

## REPORT AND RECOMMENDATION

Plaintiff Connie Endsley filed this appeal under 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying in part Endsley's applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401–434, and for supplemental security income (SSI) under Title XVI of the Social Security Act, *id.* §§ 1381–1383f. (Doc. No. 1.) The Court referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1). (Doc. No. 9.) Endsley has filed a motion for judgment on the administrative record (Doc. No. 10), to which the Commissioner has responded in opposition (Doc. No. 11). Having considered the parties' arguments and the administrative record (Doc. No. 8) as a whole, and for the reasons that follow, the Magistrate Judge will recommend that the Court deny Endsley's motion for judgment on the administrative record and affirm the Commissioner's decision.

## I.      Background

### A.      Endsley's DIB and SSI Applications

Endsley applied for DIB and SSI on March 9, 2018. (AR 119, 131.[1]) She alleged that she had been disabled and unable to work since March 15, 2017, as a result of bipolar disorder, major depression, anxiety, arthritis, fibromyalgia, and back pain. (AR 120, 132.) On May 31, 2018, the Commissioner denied Endsley's applications on initial review. (AR 143, 144.) There is no evidence in the record that Endsley requested reconsideration.

Instead, Endsley filed another SSI application on August 11, 2018, and filed another DIB application on October 8, 2018. (AR 145, 162.) Her applications allege that she has been disabled and unable to work since November 1, 2011, as a result of bipolar disorder, depression, memory loss, fibromyalgia, low back pain, chronic obstructive pulmonary disorder (COPD), emphysema, past drug addiction, a broken left ankle, tooth infections that cause pneumonia, pain in her right heel and right knee, and nerve damage on her right side. (AR 146, 163.) The Commissioner denied Endsley's applications initially. (AR 179, 180.) On reconsideration, the Commissioner found that Endsley was disabled during the closed period of August 11, 2018, through August 27, 2019, as a result of her fractured left ankle. (AR 181–254.) However, the Commissioner found that Endsley was not disabled before August 11, 2018, or after August 27, 2019. (*Id.*) At Endsley's request, an administrative law judge (ALJ) held a telephonic hearing regarding her applications on March 22, 2022. (AR 76–118, 319, 320.) Endsley appeared with a representative and testified.[2] (AR 78, 83–

---

[1]      The transcript of the administrative record (Doc. No. 8) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

[2]      The hearing transcript mistakenly identifies Endsley's representative as an attorney. (AR 76, 78.) However, other documents in the administrative record confirm that he was a non-attorney representative. (AR 295, 297.)

97, 99–109, 113, 114.) The ALJ also heard testimony from a vocational expert. (AR 98, 109–13, 115, 116.) The ALJ issued a partially favorable written decision on May 4, 2022, finding that Endsley was disabled and entitled to DIB and SSI benefits for the closed period of August 11, 2018, through August 27, 2019, but otherwise denying Endsley's DIB and SSI claims. (AR 261–86.)

The Social Security Appeals Council granted Endsley's request for review, vacated the ALJ's decision, and remanded Endsley's claims for further administrative proceedings. (AR 287–93, 389–403.) The Appeals Council found that "further consideration of [Endsley's] residual functional capacity [was] warranted" because "[t]he evidence show[ed] that [Endsley] was advised to elevate her leg several times a day or wear a compression stocking[,]" but it was "unclear how long the customary breaks [were] and how they should be spread throughout the day." (AR 289.) The Appeals Council also instructed that, on remand, "[f]urther consideration should be given to [Endsley's] maximum residual functional capacity" because a "[c]onsultative examination" in the record "indicate[d] [Endsley] was using a cane to help with ambulation because of her left ankle[,]" but the ALJ's residual functional capacity did "not include the use of a cane for ambulation." (*Id.*)

On remand from the Appeals Council, the same ALJ held a second telephonic hearing on June 27, 2023, regarding Endsley's claims. (AR 52–75.) Endsley again appeared with a representative and testified. (AR 54, 56–58, 60–69.) The ALJ also heard testimony from a vocational expert. (AR 58, 59, 69–73.)

### B.    The ALJ's Findings on Remand from the Appeals Council

On July 25, 2023, the ALJ issued a partially favorable written decision finding that Endsley was not disabled from March 9, 2018, through August 10, 2018, but she became disabled on August 11, 2018, and remained disabled through August 27, 2019, after which she experienced medical improvement and was no longer disabled. (AR 17–40.) The ALJ granted Endsley DIB

3

and SSI benefits for the closed period of disability but otherwise denied her claims. (*Id.*) The ALJ's written decision includes the following enumerated findings:

1.     [Endsley] meets the insured status requirements of the Social Security Act through June 30, 2024.

2.     [Endsley] has not engaged in substantial gainful activity since March 15, 2017, the alleged onset date of disability of the prior Title II claim, which is the earliest possible onset date with the current and prior Title II and Title XVI applications (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

\*      \*      \*

3.     [Endsley] had the following severe impairments in the period from March 15, 2017, through August 10, 2018: depressive disorder, bipolar I disorder, anxiety disorder, and attention deficit hyperactivity disorder (ADHD) (20 CFR 404.1521 et seq. and 416.921 et seq.).

\*      \*      \*

4.     In the period from March 15, 2017, though August 10, 2018, [Endsley] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

\*      \*      \*

5.     After careful consideration of the entire record, the undersigned finds that for the period from March 15, 2017, through August 10, 2018, [Endsley] had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she could understand, remember, and carry out simple and detailed, not complex tasks; she could maintain concentration, persistence, or pace for such tasks with customary breaks in an eight-hour workday; she could interact appropriately with supervisors, coworkers, and the public; and she could adapt to occasional changes in the workplace.

\*      \*      \*

6.     For the period from March 15, 2017, through August 10, 2018, [Endsley] was capable of performing past relevant work as an assembler and welding-machine tender. This work does not require the performance of work-related activities precluded by [Endsley]'s residual functional capacity (20 CFR 404.1565 and 416.965).

\*      \*      \*

7.      From August 11, 2018, through August 27, 2019, the period during which [Endsley] was under a disability, [Endsley] had the following severe impairments: left ankle fracture, arthritis, fibromyalgia, chronic obstructive pulmonary disease (COPD), obstructive sleep apnea (OSA), obesity, major depressive disorder, bipolar I disorder, generalized anxiety disorder, and ADHD (20 CFR 404.1520(c) and 416.920(c)).).

*      *      *

8.      From August 11, 2018, through August 27, 2019, the period during which [Endsley] was disabled, the severity of [Endsley]'s left ankle fracture met the criteria of section 1.22 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d) and 416.925).

*      *      *

9.      [Endsley]'s substance use disorder is not a contributing factor material to the determination of disability (20 CFR 404.1535 and 416.935).

*      *      *

10.      [Endsley] has not developed any new impairment or impairments since August 28, 2019, the date [Endsley]'s disability ended. Thus, [Endsley]'s current severe impairments are the same as that present from August 11, 2018, through August 27, 2019.

11.      Beginning August 28, 2019, [Endsley] has not had an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1594(f)(2) and 416.994(b)(5)(i)).

*      *      *

12.      Medical improvement occurred as of August 28, 2019, the date [Endsley]'s disability ended (20 CFR 404.1594(b)(1) and 416.994(b)(1)(i)).

*      *      *

13.      The medical improvement that has occurred is related to the ability to work because [Endsley] no longer has an impairment or combination of impairments that meets or medically equals the severity of a listing (20 CFR 404.1594(c)(3)(i) and 416.994(b)(2)(iv)(A)).

14.      After careful consideration of the entire record, the undersigned finds that, beginning August 28, 2019, [Endsley] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she can lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can occasionally operate foot controls with her left lower extremity; she can

occasionally crawl and climb ramps, stairs, ladders, ropes, or scaffolds; she can frequently balance, stoop, kneel, and crouch; she must avoid concentrated exposure to temperature extremes, humidity, pulmonary irritants, unprotected heights, and moving machinery; she can understand, remember, and carry out simple and detailed, not complex tasks; she can maintain concentration, persistence, or pace for such tasks with customary breaks in an eight-hour workday; she can interact appropriately with supervisors, coworkers, and the public; and she can adapt to occasional changes in the workplace.

* * *

15. Beginning August 28, 2019, [Endsley] has been capable of performing past relevant work as an assembler. This work does not require the performance of work-related activities precluded by [Endsley]'s current residual functional capacity (20 CFR 404.1565 and 416.965).

* * *

16. [Endsley] was not disabled from March 15, 2017, through August 10, 2018, but she became disabled on August 11, 2018, and her disability ended on August 28, 2019. She has not become disabled again since that date (20 CFR 404.1594 and 20 CFR 416.994).

(AR 22–39.) The Appeals Council denied Endsley's request for review on April 18, 2024, making the ALJ's July 25, 2023 written decision the final decision of the Commissioner. (AR 1–10.)

### C. Appeal Under 42 U.S.C. §§ 405(g) and 1383(c)

Endsley filed this action for review of the ALJ's decision on May 31, 2024 (Doc. No. 1), and the Court has jurisdiction under 42 U.S.C. § 405(g). Endsley's primary argument is that the ALJ erred in finding medical improvement related to her ability to work as of August 28, 2019. (Doc. No. 10-1.) Endsley also argues that the ALJ erred in finding that she could perform a full range of work without exertional limitations before August 11, 2018. (*Id.*) The Commissioner responds that the ALJ followed applicable SSA regulations and that the ALJ's determinations are supported by substantial record evidence. (Doc. No. 11.) The Commissioner also argues that Endsley waived her argument regarding the time period before August 11, 2018. (*Id.*) Endsley did not file an optional reply.

### D. Review of the Record

The ALJ and the parties have thoroughly described and discussed the medical and testimonial evidence in the administrative record. Accordingly, the Court will discuss those matters only to the extent necessary to address the parties' arguments.

## II. Legal Standards

### A. Standard of Review

This Court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 103 (quoting *Consol. Edison Co.*, 305 U.S. at 229); *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). Further, "[t]he Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Where an ALJ fails to follow those rules or regulations, "we find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741 F.3d at 722).

## B.     Determining Disability at the Administrative Level

DIB and SSI benefits are available to individuals who are disabled, which is defined in this context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (explaining that this definition applies in the DIB and SSI contexts).

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). For purposes of this case, the regulations governing initial disability determination for DIB and SSI benefits are identical. *See Colvin*, 475 F.3d at 730 (citing 20 C.F.R. §§ 404.1520, 416.920). At step one, the ALJ considers the claimant's work activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). "[I]f the claimant is performing substantial gainful activity, then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step two, the ALJ determines whether the claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "If the claimant does not have a severe impairment or combination of impairments [that meets the durational requirement], then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained by the SSA that "identifies and defines impairments that are of sufficient severity as to prevent any gainful activity." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); *see* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled." *Miller*, 811 F.3d at 834 n.6. If not, the ALJ proceeds to step four.

*Combs*, 459 F.3d at 643; *see also Walker v. Berryhill*, No. 3:16-1231, 2017 WL 6492621, at *3 (M.D. Tenn. Dec. 19, 2017) (explaining that "[a] claimant is not required to show the existence of a listed impairment in order to be found disabled, but such showing results in an automatic finding of disability and ends the inquiry"), *report and recommendation adopted*, 2018 WL 305748 (M.D. Tenn. Jan. 5, 2018).

At step four, the ALJ evaluates the claimant's past relevant work and "'residual functional capacity,' defined as 'the most [the claimant] can still do despite [her] limitations.'" *Combs*, 459 F.3d at 643 (alterations in original) (quoting 20 C.F.R. § 404.1545(a)(1)); *see* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Past work is relevant to this analysis if the claimant performed the work within the past 15 years, the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). If the claimant's residual functional capacity (RFC) permits her to perform past relevant work, she is not disabled. *Combs*, 459 F.3d at 643. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, "in light of [her] residual functional capacity, age, education, and work experience," a claimant can perform other substantial gainful employment. *Id.* While the claimant bears the burden of proof during the first four steps, at step five the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). "Claimants who can perform such work are not disabled." *Combs*, 459 F.3d at 643; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### C.    Administrative Standards for Terminating Disability Benefits

Recipients of disability benefits, including DIB and SSI benefits, are subject to review of their continued entitlement to those benefits. 42 U.S.C. § 423(f); 20 C.F.R. §§ 404.1594(a),

9

416.994(a). There is no presumption of continuing disability merely because the SSA determined that an individual previously was disabled. *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 & n.1 (6th Cir. 1994) (quoting 42 U.S.C. § 423(f)); *see also Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007) (citing *Cutlip*, 25 F.3d at 286 n.1). The SSA must neutrally review "all the evidence available in the individual's case file, including new evidence concerning the individual's prior or current condition" to determine if a claimant remains disabled under the relevant standards. 42 U.S.C. § 423(f); *see also* 20 C.F.R. §§ 404.1594(b)(6), 416.994(b)(1)(vi). If substantial evidence shows that there has been medical improvement and that the individual is now able to engage in substantial gainful activity, the SSA will terminate DIB and SSI benefits. 42 U.S.C. § 423(f)(1).

The SSA employs an eight-step process for terminating DIB benefits and a seven-step process for terminating SSI benefits to ensure "that any decisions to stop disability benefits are made objectively, neutrally[,] and are fully documented[.]" 20 C.F.R. §§ 404.1594(f), 416.994(b)(5). The difference between these two analyses lies in the first step of the DIB analysis, which addresses the "threshold consideration of the claimant's performance of substantial gainful activity." *Dulworth v. Saul*, Civ. No. 2:19-0035, 2020 WL 3564479, at *4 (M.D. Tenn. May 22, 2020), *report and recommendation adopted*, 2020 WL 3549668 (M.D. Tenn. June 30, 2020); *see also* 20 C.F.R. § 404.1594(f)(1). Otherwise, steps two through eight in the DIB termination analysis are identical to steps one through seven in the SSI termination analysis. *Dulworth*, 2020 WL 3564479, at *4; *compare* 20 C.F.R. § 404.1594(f)(2)–(9), *with* 20 C.F.R. § 416.994(b)(5)(i)–(viii).

At step one of the DIB termination analysis, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1594(f)(1). If so, the claimant is no longer

disabled. *Id.* At step two of the DIB termination analysis and step one of the SSI termination analysis, the ALJ determines if the claimant suffers from a medically determinable physical or mental "impairment or combination of impairments which meets or equals the severity of an impairment" identified by the SSA as severe enough to prevent any gainful activity. *Id.* §§ 404.1594(f)(2), 416.994(b)(5)(i). If the claimant's impairment meets or equals one of the listings, then her "disability will be found to continue." *Id.* §§ 404.1594(f)(2), 416.994(b)(5)(i). At step three of the DIB termination analysis and step two of the SSI termination analysis, the ALJ considers whether the claimant has experienced "medical improvement[,]" defined as "any decrease in the medical severity of [the claimant's] impairment(s)" since the SSA last determined that the claimant was disabled. *Id.* §§ 404.1594(b)(1), (f)(3), 416.994(b)(1)(i), (b)(5)(ii). "A determination that there has been a decrease in medical severity must be based on [positive changes] in the symptoms, signs, and/or laboratory findings associated with [the claimant's] impairment(s)." *Id.* §§ 404.1594(b)(1), 416.994(b)(1)(i). If there has been medical improvement, the inquiry proceeds to the next step, where the ALJ determines if that improvement is related to the claimant's ability to work, "i.e., whether or not there has been an increase in the [claimant's] residual functional capacity . . . ." *Id.* §§ 404.1594(f)(4), 416.994(b)(5)(iii). If there is no medical improvement, or if the medical improvement is unrelated to the claimant's ability to work, the ALJ proceeds to step five of the DIB termination analysis and step four of the SSI termination analysis and will find that the claimant's disability continues unless one of several exceptions listed in § 404.1594(d)–(e) and § 416.994(b)(3)–(4) applies. *Id.* §§ 404.1594(f)(5), 416.994(b)(5)(iv). If there is medical improvement related to the claimant's ability to work, or if an exception applies, then the ALJ considers at step six of the DIB termination analysis and step five of the SSI termination analysis whether "all [the claimant's] current impairments in combination are severe

. . . ." *Id.* §§ 404.1594(f)(6), 416.994(b)(5)(v). If the claimant's "current impairments in combination do not significantly limit [her] physical or mental abilities to do basic work activities, these impairments will not be considered severe" and the claimant "will no longer be considered to be disabled." *Id.* If the claimant's impairments are severe, the ALJ at step seven of the DIB termination analysis and step six of the SSI termination analysis assesses the claimant's RFC and determines if she can still do past work. *Id.* §§ 404.1594(f)(7), 416.994(b)(5)(vi). If a claimant can do past work, then her disability has ended. *Id.* If a claimant cannot perform past work, or if there is not sufficient evidence to determine whether the claimant can resume past work, the ALJ proceeds to step eight of the DIB termination analysis and step seven of the SSI termination analysis and determines whether the claimant can do other work considering her RFC, age, education, and past work experience. *Id.* §§ 404.1594(f)(8)–(9), 416.994(b)(5)(vii)–(viii). If she can perform other work, her disability has ended; if she cannot, her disability continues. *Id.* §§ 404.1594(f)(8), 416.994(b)(5)(vii).

Unlike in initial disability proceedings, "the ultimate burden of proof lies with the Commissioner in termination proceedings." *Kennedy*, 247 F. App'x at 765. Specifically, "the Commissioner bears the burden of proving *both* work-related medical improvement and that the claimant is currently able to engage in substantial gainful activity." *Delacotera v. Berryhill*, Case No. 3:16-cv-01464, 2017 WL 971935, at *4 (M.D. Tenn. Mar. 14, 2017) (Trauger, J.).

### III.     Analysis

#### A.     The ALJ's Determination the Endsley Had the Residual Functional Capacity to Perform a Full Range of Work Without Exertional Limitations from March 15, 2017, through August 10, 2018

The ALJ found that, in the time period from March 17, 2017, through August 10, 2018, Endsley had severe mental impairments including depressive disorder, bipolar I disorder, anxiety disorder, and ADHD. (AR 22–23.) The ALJ acknowledged that Endsley "also had arthritis,

fibromyalgia, and some episodes of acute back pain" during this time period, but the ALJ found that these physical impairments "were nonsevere" because "there [was] insufficient evidence to show these impairments more than mildly limited [Endsley's] functioning for a duration of 12 consecutive months . . . ." (AR 23.) In determining Endsley's RFC for this time period, the ALJ found that Endsley "had the residual functional capacity to perform a full range of work at all exertional levels" with a few "nonexertional limitations" based on her severe mental impairments. (AR 25.)

Endsley argues that the ALJ's RFC for this time period should have included exertional limitations based on her physical impairments because "the record supports the determination that [she] could perform less than sedentary work . . . from March 17, 2017[,] through August 10, 201[8][.]" (Doc. No. 10-1, PageID# 2736.) Endsley points to two pieces of record evidence in support of this argument. First, she argues that "March 2017[ ] treatment notes show that [she] appeared distressed, and an examination of her back revealed midline lumbar tenderness and mild paraspinal tenderness in the lumbar region." (*Id.* (citing AR 958).) Second, Endsley argues that "March 28, 2017 testing revealed that [her] kidney failure was classified as stage 3." (*Id.* (citing AR 737).) Endsley did not include this alleged error in the statement of errors in her brief, and she concedes that this argument is not "[t]he main issue in this case[.]" (*Id.*) The Commissioner argues that this argument "should be [deemed] waived" because it "cites only two facts" and "is skeletal and underdeveloped . . . ." (Doc. No. 11, PageID# 2749 (citing *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003)).)

The Commissioner is correct that, typically, "'[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived'" because "'[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court

to put flesh on its bones.'" *Dollinger v. Comm'r of Soc. Sec.*, Case No. 22-3359, 2023 WL 1777386, at *1 n.1 (6th Cir. Feb. 6, 2023) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). The Court finds that Endsley has made sufficient effort to develop this argument that it has not been waived, but Endsley has not shown that she is entitled to relief on this ground.

The first piece of record evidence Endsley identifies in support of this argument shows that, on July 12, 2017, she presented to the emergency room at Marshall Medical Center in Lewisburg, Tennessee, "complaining of lumbar back pain that [was] worse with movement." (AR 957.) Endsley stated that "she ha[d] been at work lifting beanbag[ ]s where she suspects she injured [her back]." (*Id.*) Endsley "[d]enie[d] any direct trauma" and "denie[d] [having a] history of back problems." (*Id.*) Notes from a physical examination state that Endsley's "[g]eneral [a]ppearance" was "[a]lert" and "[m]ild[ly] distress[ed]" and that examination of her "[b]ack" showed "no midline lumbar tenderness" and "mild paraspinal tenderness in the lumbar region." (AR 958.) A medical provider diagnosed Endsley with "[a]cute lumbar back pain" and recommended that she follow up with a primary care provider for further evaluation. (*Id.*) The notes state that Endsley was "comfortable for discharge" and did "not want narcotic medication given that she is in recovery." (*Id.*)

Endsley argues that this evidence "undermine[s] the ALJ's determination that [she] could perform a full range of work at all exertional levels during the period prior to August 11, 2018." (Doc. No. 10-1, PageID# 2736.) The ALJ considered and cited this evidence in finding that Endsley had "some episodes of acute back pain in the period from March 15, 2017, through August 10, 2018." (AR 23.) However, the ALJ determined that there was "insufficient evidence to show" that Endsley's back pain "more than mildly limited [her] functioning for a duration of 12 consecutive months . . . prior [to] August 10, 2018." (*Id.*) In support of this determination, the ALJ

relied on a consulting medical opinion from Reeta Misra, M.D., who reviewed Endsley's medical records in connection with her DIB and SSI applications and found that Endsley's back pain was "non-severe" because of a lack of "objective evidence" and mostly "[n]ormal exams in [the] documentation" Misra reviewed. (AR 26, 123, 135.)

Even if the evidence of back pain that Endsley identifies "is considered to be substantial, it is insufficient on its own to warrant reversal." *Shelton v. Comm'r of Soc. Sec.*, Case No. 2:18-cv-00093, 2020 WL 707586, at *9 (M.D. Tenn. Feb. 12, 2020), *report and recommendation adopted sub nom. Shelton v. Saul*, 2020 WL 1284628 (M.D. Tenn. Mar. 18, 2020). This Court must defer to an ALJ's finding that is supported by substantial evidence "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also id.* ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." (alteration in original) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Endsley has not shown that the ALJ's determination, based on Misra's medical opinion, that Endsley's back pain did not significantly limit her functioning for twelve months or more before August 11, 2018, lacks the support of substantial record evidence.

The second piece of record evidence Endsley identifies in support of her argument regarding the ALJ's RFC for this time period is a copy of laboratory test results from a sample of

Endsley's blood collected on January 28, 2018. (AR 737.) The results state that Endsley's "GFR" was "59" and include a chart stating that:

```
gfr estimate at eht following level for >Or-3 months is
classified as follows:
GFR                WITH KIDNEY DAMAGE      WITHOUT KIDNEY DAMAGE
>or-90             Stage 1                    Normal
60-89              Stage 2                 "Decreased GFR"
30-59              Stage 3                    Stage 3
15-29              Stage 4                    Stage 4
<15 (or dialysis)  Stage 5                    Stage 5
Estimated GFR will overestimate true GFR if serum creatinine
is rising as in acute renal failure and will underestimate
true GFR if serum creatinine is declining as in resolving
acute renal failure.
```

(*Id.*) Endsley argues, without further explanation, that this evidence demonstrates that her "kidney failure was classified as stage 3."[3] (Doc. No. 10-1, PageID# 2736.)

But Endsley did not identify kidney disease as a basis for her DIB and SSI claims and did not testify that she experienced any symptoms of kidney disease. The Commissioner argues that Endsley's "tests show only the very initial stage of kidney disease, and 'many people do not experience symptoms of kidney disease until the later stages.'" (Doc. No. 11, PageID# 2750 (citation omitted).) Endsley has not responded to this argument. Other courts have recognized that "[p]atients with stage three kidney disease who are not undergoing dialysis typically experience

---

3  For context, the Court notes that:

> The National Kidney Foundation ("NKF") created a guideline to help doctors identify each level of kidney disease. The NKF divided kidney disease into five stages. Glomerular filtration rate ("GFR") is the best measure of kidney function. The GFR is the number used to figure out a person's stage of kidney disease. A math formula using the person's age, race, gender, and their serum creatinine is used to calculate GFR. A person with Stage III kidney disease has kidney damage with moderate decrease in the GFR. In Stage III, a person is more likely to develop complications of kidney disease such as high blood pressure, anemia, and/or early bone disease.

*Smith v. Comm'r of Soc. Sec.*, No. 3:11-cv-221, 2012 WL 1185997, at *3 n.2 (S.D. Ohio Apr. 9, 2012).

slightly diminished kidney function, low risk of kidney failure, and either no symptoms or very mild symptoms." *United States v. Montoya*, CRIM. NO. 18-10225, 2022 WL 872628, at *2 (D. Mass. Mar. 24, 2022). Considering the parties' arguments and the record evidence as a whole, Endsley has not shown that remand is warranted based on these test results.

She therefore has not shown that the ALJ erred in determining her RFC for the period before August 11, 2018.

**B.     The ALJ's Determination that Endsley Experienced Medical Improvement of Her Left Ankle Fracture Rendering Her Able to Work as of August 28, 2019**

Endsley argues that "[t]he main issue in this case . . . is whether the ALJ's analysis of medical improvement leading to the conclusion that [Endsley's] RFC renders her able to work[ ] is legally correct and supported by substantial evidence." (Doc. No. 10-1, PageID# 2736.)

The ALJ's determination of medical improvement is intertwined with the ALJ's finding that Endsley was previously disabled because her left ankle fracture met the criteria of listing 1.22 in 20 C.F.R. part 404, subpart P, appendix 1.

The listing of impairments in appendix 1 of subpart P of part 404 of chapter 20 of the Code of Federal Regulations "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Listing 1.22 describes "[n]on-healing or complex fracture[s] of the femur, tibia, pelvis, or one or more of the talocrural bones" that the SSA considers disabling. *Id.* pt. 404, subpt. P, app. 1, § 1.22. The "talocrural joint" is the "ankle[.]" *Id.* § 1.20(C). The SSA defines "[a] non-healing (nonunion) fracture" as "a fracture that has failed to unite completely. Nonunion is usually established when a minimum of 9 months has elapsed since the injury and the fracture site has shown no, or minimal, progressive signs of healing for a minimum of 3 months." *Id.* § 1.20(M)(1). Listing 1.22 has three

paragraphs, designated A, B, and C. *Id.* § 1.22(A)–(C). To meet or medically equal this listing, a claimant with a non-healing or complex fracture of the femur, pelvis, or one or more of the talocrural bones must have documentation satisfying the criteria in all three paragraphs. *Id.*

Paragraph A requires that "[s]olid union [is] not evident on imaging and not clinically solid." *Id.* § 1.22(A) (citation omitted).

Paragraph B requires an "[i]mpairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months." *Id.* § 1.22(B).

Paragraph C requires "[a] documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands." *Id.* § 1.22(C) (citations omitted). "[T]he phrase 'documented medical need,' [ ] mean[s] that there is evidence from a medical source that supports [the claimant's] medical need for an assistive device for a continuous period of at least 12 months" and "describe[s] any limitation(s) in [the claimant's] upper or lower extremity functioning and the circumstances for which [the claimant] need[s] to use the assistive device." *Id.* § 1.00(C)(6)(a).

Here, the ALJ found that:

. . . from August 11, 2018, through August 27, 2019, the severity of [Endsley]'s left ankle fracture met listing 1.22 because a solid union was not evident on imaging and was not clinically solid; the impairment-related physical limitation of musculoskeletal functioning lasted for a continuous period of at least 12 months; and there was a documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device as defined in listing 1.22 (Non-healing or complex fracture of the femur, tibia, pelvis, or one or more of the talocrural bones).

Medical records show [Endsley] fell while walking on a football field on August 11, 2018, and sustained fractures to her left ankle (Ex. 25F, pg. 21). She underwent an open reduction internal fixation (ORIF) of the left distal tibia and fibular fractures on August 12, 2018, but she had nonunion of the tibia fracture (Exs. 25F–26F).

A CT of [Endsley]'s left leg performed on April 22, 2019, showed the ORIF of the old distal tibia and fibular fractures. There was evidence of bony bridging at the distal fibula and partial bony bridging of the distal tibia fractures (Ex. 16F, pg. 1). On April 26, 2019, [Endsley] underwent removal of painful hardware and had an ORIF for repair of the nonunion (Ex. 16F, pgs. 2–4). [Endsley] required use of a walking boot after the surgery (Ex. 16F). She also used a cane (Ex. 28F). X-rays of [Endsley]'s left ankle performed in July 2019 showed the fracture was not fully healed (Ex. 18F, pg. 4). However, x-rays performed in the following month in August 2019 showed the tibial fracture was healed with internal fixation in place (Ex. 19F, pg. 20). Treatment records by [Endsley]'s orthopedist in April 2020 show [Endsley] was full weight bearing with a regular shoe. Moreover, no use of a cane was mentioned at that time (Ex. 26F, pg. 18).

As for the medical opinions, on October 10, 2019, Tonia Jackson, M.D., viewed the evidence and opined [Endsley] can perform work at the light exertional level with a limitation for standing and walking a total of four hours in addition to postural and environmental limitations (Exs. 5A, 6A). The undersigned finds Dr. Jackson's opinion is only partially persuasive because treatment records show [Endsley]'s left ankle fracture met listing 1.22 for a closed period of disability from August 11, 2018, through August 27, 2019.

On June 15, 2021, Larry McNeil, M.D., viewed the evidence and found [Endsley]'s left ankle fracture met listing 1.22 for a closed period of disability from August 11, 2018, through August 27, 2019. He also found the evidence was insufficient to assess [Endsley]'s physical impairments in the period from her alleged onset date of disability to August 10, 2018. Additionally, Dr. McNeil opined that as of August 28, 2019, [Endsley] can perform work at the light exertional level with pushing/pulling, postural, and environmental limitations (Exs. 9A, 10A). The undersigned finds Dr. McNeil's opinion is persuasive because it is generally consistent with the evidence considered in its entirety.

(AR 27–28.)

The ALJ further found that:

Medical records show [Endsley] had improvement of her left ankle fracture as of August 28, 2019. Imaging and examinations show [Endsley]'s ankle fracture no longer had evidence of a nonunion (Exs. 19F, 26F). During an office visit in December 2019, treatment notes only mention use of a walking boot with no mention of use of a cane (Ex. 26F, pg. 31). Additionally, on April 7, 2020, [Endsley] was noted to be full weight-bearing with a regular shoe, and there was no mention of use of a cane at that time (Ex. 26F, pg. 18). Furthermore, several subsequent physical examinations note [Endsley]'s normal ambulation, gait, and station, which would not support a finding that the claimant required continued use of a cane (Exs. 27F, 31F–32F, 34F).

(AR 31.) The ALJ therefore concluded that, "as of August 28, 2019, the medical evidence does not show a non-union or complex fracture of [Endsley's] left ankle to meet the criteria of listing 1.22." (AR 29.)

Endsley argues that the ALJ erred in making enumerated finding thirteen—that medical improvement related to Endsley's ability to work occurred and that Endsley no longer has an impairment or combination of impairments that meets a listing (AR 31)—because "the ALJ cite[d] no evidence in support of this determination . . . ." (Doc. No. 10-1, PageID# 2738 (citing AR 31).) This argument is unfounded. As shown in the above-quoted passages, the ALJ repeatedly cited and discussed record evidence documenting the progress of Endsley's left ankle fracture, including medical imaging and examination results, in other parts of the written decision. (AR 27–29, 31, 33, 35, 36, 38.) Endsley asks the Court to find that the ALJ's thirteenth enumerated finding lacks the support of substantial record evidence because the ALJ did not repeat this evidence and analysis in a paragraph following finding thirteen. (Doc. No. 10-1.) But reviewing courts "read the ALJ's decision as a whole and with common sense." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010). An ALJ is not required to "spell out every fact a second time" if the ALJ has "described" the evidence "and made factual findings" about the evidence elsewhere in the opinion. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006); *see also Rogenski v. Comm'r of Soc. Sec.*, CASE NO. 4:21-cv-01847, 2023 WL 2521061, at *2 (N.D. Ohio Mar. 15, 2023) ("[A] reviewing court reads an ALJ's decision as a whole and the ALJ is not required to 'reproduce the list of . . . [evidence]' multiple times . . . ." (first quoting *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016); and then citing *Bledsoe*, 165 F. App'x at 411)). "There is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph." *Stinedurf v. Comm'r of Soc. Sec.*, Case No. 4:19 cv 0485, 2019 WL 7484050, at

20

*9 (N.D. Ohio Dec. 20, 2019) (citing *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79). Endsley has not shown that remand is warranted on this ground.

Endsley also argues that, in the course of determining her RFC for the period after August 28, 2019, the ALJ erred in finding that Endsley's "ankle improved in April 2019 after a repair surgery" because "the ALJ interpret[ed] the raw data without the benefit of a medical professional, which is impermissible." (Doc. No. 10-1, PageID# 2738 (citing AR 33).) Endsley does not specify what "raw data" the ALJ interpreted. The page of the ALJ's decision Endsley cites includes the following discussion of medical records related to Endsley's April 2019 repair surgery:

> Medical records show [Endsley] had improvement in her left ankle after her April 2019 repair surgery (Ex. 26F). X-rays of [Endsley]'s left ankle performed in July 2019 showed the fracture was not fully healed (Ex. 18F, pg. 4). However, x-rays performed the following month in August 2019 showed the tibial fracture was healed with internal fixation in place (Ex. 19F, pg. 20). Treatment records by [Endsley]'s orthopedist in December 2019 indicate [Endsley] was only using the walking boot for assistance (Ex. 26F, pg. 32). X-rays of [Endsley]'s left ankle performed in December 2019 showed the tibial fracture was healed with the medial plate in place, but there were multiple broken screws from the first surgery (Ex. 26F, pg. 15). Subsequent treatment records by [Endsley]'s orthopedist in April 2020 show [Endsley] was full weight bearing with a regular shoe. Moreover, no use of a cane was mentioned at that time (Ex. 26F, pg. 18).

(AR 33.) The pages of the administrative record that the ALJ cites in this paragraph are treatment records from Endsley's orthopedic care at Mid-Tennessee Bone and Joint clinic signed by Randall L. Davidson, Jr., M.D. (AR 1846, 1867, 2017–53.) While "x-rays" themselves may be considered "raw medical data," x-ray results that have "already been read and interpreted by a radiologist" are not. *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013). Moreover, an ALJ may properly evaluate medical evidence of a claimant's "physical condition without the assistance of a medical expert." *Id.*; *see also id.* at 726–27 (collecting authority for the principle that SSA "regulations require the ALJ to evaluate the medical evidence to determine whether a claimant is disabled"). Here, the ALJ cited Dr. Davidson's treatment notes summarizing Endsley's ankle x-

21

ray results. (AR 33 (citing AR 1846, 1867, 2031).) The ALJ also cited Dr. Davidson's examination

and treatment notes. (AR 33 (citing AR 2034, 2048).) There is nothing "raw" about this evidence,

and, contrary to Endsley's argument, there is no indication that the ALJ improperly substituted his

own medical judgment for that of medical experts.

Endsley argues generally that "[t]he ALJ failed to develop the record with respect to the

period of time following [Endsley's] surgery, in which the ALJ found that [Endsley's] impairments

had medically improved." (Doc. No. 10-1, PageID# 2738.) But this argument again ignores the

substantial medical record evidence that the ALJ cited and discussed in determining that Endsley's

left ankle fracture healed to the point that it no longer met the criteria of listing 1.22.

Endsley also argues that the ALJ's RFC determination for the period of time after August

28, 2019, lacks the support of substantial record evidence. (Doc. No. 10-1.) The ALJ determined

"that, beginning August 28, 2019, [Endsley] ha[d] the residual functional capacity to perform light

work as defined in 20 CFR 404.1567(b) and 416.967(b)" with the following exertional limitations

based on Endsley's medically determinable physical impairments:

> [Endsley] can lift and/or carry 20 pounds occasionally and 10 pounds frequently;
> she can occasionally operate foot controls with her left lower extremity; she can
> occasionally crawl and climb ramps, stairs, ladders, ropes, or scaffolds; she can
> frequently balance, stoop, kneel, and crouch; she must avoid concentrated exposure
> to temperature extremes, humidity, pulmonary irritants, unprotected heights, and
> moving machinery[.]

(AR 31.) The ALJ provided the following analysis in support of the RFC determination for this

period:

> At the March 2022 hearing, [Endsley] testified that she fell and broke her ankle at
> her grandson's football game. She stated that she underwent a total of three
> surgeries on her ankle. She also stated that she continues to have pain in her ankle,
> and she falls. [Endsley] testified that her ankle pain is aggravated by the weather
> and her activity. She further testified that she has arthritis and knee pain, especially
> in her right knee. She stated that she has difficulty balancing. [Endsley] testified
> that she is no longer in a walking boot for her ankle, but she uses a cane. [Endsley]
> further testified that she has some days when she does not use her cane. She stated

that she experiences back pain, and she was scheduled to undergo injections in her back and knees but she lost her insurance a year ago. She also stated that she needs to undergo knee replacements. [Endsley] testified that she takes fluid pills, and she uses Tylenol and ibuprofen frequently. She stated that she tried different prescription medications to treat her arthritis, but they did not help. [Endsley] further testified that she has breathing problems and must use an inhaler and a nebulizer on a daily basis. She stated that she sometimes must use her nebulizer two to three times a day, and she has sleep apnea and is scheduled to undergo a sleep study on March 30, 2022. [Endsley] testified that she will also have a pulmonary function test. [Endsley] testified that she had COVID and was unable to do activity for a month. She stated that she still gets weak quickly. [Endsley] testified that she recently began having numbness in her arms to the tips of her fingers, and her fingers swell. She stated that she is only able to stand for 15 minutes at a time and is only able to walk for 20 to 25 minutes at a time. She also stated that she can only lift light weight such as the weight of a small, six-pack of water. . . .

At the June 2023 hearing, [Endsley] testified that her left foot gets weak, shaky, and drags. She also testified that she has a burning sensation on the bottom of both her feet. [Endsley] stated that she falls two to three times a week and sometimes falls two to three times a day. She also stated that she avoids being around others because it is embarrassing to fall. [Endsley] testified that she uses a cane on some days depending on how she feels and on the weather. She stated that she uses her cane approximately 20 to 25 days a month, and her insurance paid for her cane. [Endsley] testified that she has COPD and uses a nebulizer four times a day to treat it. She stated that it takes seven to 10 minutes to use her nebulizer. She also stated that she has almost quit smoking and currently smokes less than half a pack of cigarettes per day. [Endsley] testified that she gets shortness of breath just sitting and watching television. [Endsley] testified that her heart doctor advised her not to drive, and she does not drive. [Endsley] testified that her doctor advised her to walk for five minutes, but she gets dizzy and her oxygen level gets low when she attempts to walk. She stated that it is difficult for her to walk five minutes, and she has problems sitting because her back burns. She further testified that she is not able to sit through an entire meal and must stretch and bend. [Endsley] stated that she has not had any physical therapy or surgeries since the last hearing. She stated that she feels like she is recovering from the flu all the time, and she sometimes feels dizzy and lightheaded during the day even after use of her nebulizer. She indicated that she must lie down during the day for a few minutes at a time. She also stated that she is no longer able to get on her knees or sweep or vacuum. [Endsley] testified that since February or March, a caretaker comes to her home twice a week to check on her prescription use and help her with household tasks. She stated that the caregiver also cleans her CPAP machine. She testified that the caregiver was approved through her primary care physician. Additionally, [Endsley] testified that she has mental health problems including bipolar depression. She stated that she has memory problems, difficulty concentrating, and difficulty being around others. She also indicated that her short-term memory is worse than her long-term memory, and she is unable to remember her grandchild's birthday. [Endsley] testified that she lives alone.

After considering the evidence of record, the undersigned finds that [Endsley]'s medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, [Endsley]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

Medical records show [Endsley] had improvement in her left ankle after her April 2019 repair surgery (Ex. 26F). X-rays of [Endsley]'s left ankle performed in July 2019 showed the fracture was not fully healed (Ex. 18F, pg. 4). However, x-rays performed the following month in August 2019 showed the tibial fracture was healed with internal fixation in place (Ex. 19F, pg. 20). Treatment records by [Endsley]'s orthopedist in December 2019 indicate [Endsley] was only using the walking boot for assistance (Ex. 26F, pg. 32). X-rays of [Endsley]'s left ankle performed in December 2019 showed the tibial fracture was healed with the medial plate in place, but there were multiple broken screws from the first surgery (Ex. 26F, pg. 15). Subsequent treatment records by [Endsley]'s orthopedist in April 2020 show [Endsley] was full weight bearing with a regular shoe. Moreover, no use of a cane was mentioned at that time (Ex. 26F, pg. 18).

On June 29, 2020, [Endsley] underwent another surgery on her left ankle for removal of hardware (Ex. 26F, pg. 9). [Endsley] required use of a walking boot after the surgery (Ex. 26F, pg. 11). Treatment notes by [Endsley]'s orthopedist dated September 16, 2020, show [Endsley] was no longer wearing the boot due to her improvement. [Endsley] also reported that she wraps her ankle with an ace wrap if she ever feels pain (Ex. 26F, pg. 5).

Treatment records also document [Endsley]'s arthritis including degenerative arthritis of her bilateral knees (Exs. 19F, 26F–27F). An MRI of [Endsley]'s left knee performed on August 23, 2019, showed high-grade cartilage loss about the patellar body, most pronounced in the lateral patellar facet; suspected old hardware sites about the knee; and no discrete meniscal tear (Ex. 19F, pg. 1). An MRI of [Endsley]'s right knee performed on the same date showed high-grade cartilage loss with underlying bony reactive changes of the patellar body, most pronounced in the lateral patellar facet; and free-edge volume loss of the body of the medial meniscus without discrete intrasubstance tear (Ex. 19F, pg. 3). [Endsley] underwent a steroid injection in her left knee (Ex. 19F). However, treatment notes indicate [Endsley] did not respond well to knee injections (Ex. 19F, pg. 21). The medical evidence shows [Endsley] joint pain was generally controlled with the use of gabapentin and 800 mg ibuprofen (Exs. 19F, 25F–26F). Furthermore, several subsequent physical examinations note [Endsley]'s normal ambulation, gait, and station, which support a finding that [Endsley] did not require continued use of a cane (Exs. 27F, 31F–32F, 34F).

During an office visit with her primary care physician at Lewisburg Family Practice in June 2020, [Endsley] denied having back pain, joint pain, or muscle pain, and she did not have decreased range of motion (Ex. 25F, pg. 5). Furthermore, other

subsequent treatment notes show [Endsley] was noted to have a normal gait and station (Ex. 27F).

In addition, treatment records document [Endsley]'s history of fibromyalgia (Exs. 16F, 19F, 22F, 26F–27F). However, the medical evidence shows [Endsley] has not had ongoing treatment with a rheumatologist for symptoms of fibromyalgia during the period in question. Additionally, medical records indicate [Endsley]'s symptoms of fibromyalgia were generally controlled with the use of gabapentin (Exs. 21F, 25F–26F).

Medical records also show [Endsley] has COPD (Exs. 16F, 19F, 22F, 25F, 27F). Treatment records document [Endsley]'s use of prescription medications including Advair and albuterol inhalers, and her use of nebulizer treatments at home with DuoNeb (Exs. 21F, 25F, 27F). However, records also show [Endsley]'s prior reports of continued smoking of one pack of cigarettes per day (Exs. 22F, 25F, 27F). During the June 2023 hearing, [Endsley] testified that she reduced her smoking but continues to smoke less than half a pack per day. Additionally, lung examinations are largely unremarkable during normal office visits (Exs. 25F, 27F). During an office visit in June 2020, a lung examination showed bilateral wheezes; however, they were noted to be "very mild" (Ex. 25F, pg. 6). Moreover, treatment records show [Endsley] does not have lung abnormalities every time she has a virus or other illness (Exs. 25F, 27F).

[Endsley] had an office visit with her pulmonologist on May 10, 2013 (Ex. 36F). Treatment records note [Endsley] had not been seen by the pulmonologist in over two and a half years (Ex. 36F, pg. 1). [Endsley] reported having shortness of breath with exertion and occasional wheezing (Ex. 36F, pg. 1). [Endsley] also reported that she was smoking a half pack of cigarettes per day but wanted to quit and was cutting back on her cigarette use (Ex. 36F, pg. 1). Additionally, [Endsley] reported that she had no recent hospital stays or emergency room visits (Ex. 36F, pg. 1). She also reported that she was not using her CPAP (Ex. 36F, pg. 1).

A physical examination included normal respiratory signs including [Endsley]'s clear lungs without crackles, wheeze, rhonchi, or increased work of breathing with breathing of room air (Ex. 36F, pg. 1). The physical examination also showed [Endsley] moved all extremities equally; she had no neurovascular focal deficits; her skin was normal; she had no edema; and her peripheral pulses were equal bilaterally (Ex. 36F, pg. 1). [Endsley] was also noted to be alert and oriented, pleasant, and she had an appropriate affect (Ex. 36F, pg. 1). A six-minute walking test performed on the day of the examination did not show evidence of exercise induced hypoxia (Ex. 36F, pg. 2).

[Endsley]'s pulmonologist reviewed a recent Lexiscan and noted it showed no ischemia and an ejection fraction of 68% (Ex. 36F, pg. 1). A pulmonary function test performed in July 2022 was also noted that included a forced expiratory volume in one second (FEV1) measurement of 100% (Ex. 36F, pg. 1). Chest x-rays performed on April 21, 2023, were noted to show no acute process (Ex. 36F, pg. 1).

25

Additionally, a CT of [Endsley]'s lungs performed on May 4, 2023, showed stable small lung nodules, as compared to 2020 imaging (Ex. 35F, pgs. 29–30). [Endsley]'s pulmonologist indicated the treatment plan was to repeat imaging annually (Ex. 36F, pg. 1). [Endsley] was assessed with COPD and was advised to stop smoking and to continue use of her Trelegy medication and albuterol as needed (Ex. 36F, pg. 1). The medical evidence shows [Endsley]'s COPD is generally controlled with the use of prescription medications (Exs. 31F, 32F–35F).

Additionally, treatment records show [Endsley] has OSA. [Endsley] was prescribed a continuous positive airway pressure (CPAP) machine for treatment of her OSA. However, treatment records in June 2020 show [Endsley] was not compliant with its use. [Endsley] reported a problem with the machine (Ex. 25F, pg. 10). [Endsley] testified that she was scheduled to have another sleep study, but it was delayed to March 30, 2022.

Advanced Neurology & Sleep medical records in August 2022 show [Endsley]'s subsequent complaints of memory impairment and her report of sleep apnea for several years (Ex. 34F, pg. 1). [Endsley] was noted to have 3/5 delayed recall and assessed with a mild cognitive impairment (Ex. 34F, pg. 1). A CT of [Endsley]'s head performed in June 2022 was reviewed and noted to show no evidence of acute intracranial abnormality (Ex. 34F, pg. 1). [Endsley] was encouraged to have the sleep study performed (Ex[.] 34F, pg. 1). A sleep study performed in March 2023 showed OSA with successful bilevel titration at 8/4 cm (Ex. 35F, pg. 15).

On March 18, 2021, consultative examiner, Woodrow Wilson, M.D., examined [Endsley] and noted she was obese, alert, and in no obvious distress; she had a cane with her but was able to ambulate without its use; and she did use the cane to push herself up from a chair (Ex. 24F, pg. 7). Additionally, Dr. Wilson noted [Endsley] had a very mild limp while walking with her cane, but her limp was not really noticeable; she could tandem walk six steps with only little difficulty; she could get up on her tiptoes, back of her heels, and balance weight on each leg independently; she had some reduced range of motion in her shoulders, right hip, and left ankle; she had full range of motion in her elbows, wrists, hands, knees, and right ankle; she had good plantar flexion of the left ankle; she had no joint effusion; she had no calf tenderness; she had no swelling or pitting edema; her motor strength was 5/5; her sensation was intact; and straight leg raising tests were negative bilaterally (Ex. 24F, pg. 8). Dr. Wilson listed the following diagnoses: apparent history of fibromyalgia with no supporting documentation; chronic low back pain; chronic left ankle pain from an old fracture and surgical repair; history of COPD with continued tobacco use; history of dental infections; and history of osteoarthritis with multiple joint involvement (Ex. 24F).

X-rays of [Endsley]'s left ankle performed in conjunction with Dr. Wilson's examination showed removal of orthopedic hardware; old healed distal tibia and fibular fractures; and no acute bone findings were identified (Ex. 24F, pg. 2). X-rays of [Endsley]'s right knee showed no acute findings or significant degenerative change (Ex. 24F, pg. 5). X-rays of [Endsley]'s lumbar spine showed multilevel

degenerative lumbar spine changes and facet changes without acute abnormality (Ex. 24F, pg. 3). X-rays of [Endsley]'s chest showed no acute cardiopulmonary disease (Ex. 24F, pg. 4).

On December 10, 2021, [Endsley] had an office visit with her orthopedist with complaints of low back pain (Ex. 31F, pg. 15). X-rays of [Endsley]'s lumbar spine showed only mild degenerative changes (Ex. 31F, pg. 1). A physical examination showed [Endsley] had a normal gait and station, intact neurological findings, and full flexion, extension, and rotation of the spine (Ex. 31F, pg. 15). [Endsley] was noted to have positive straight leg raise test results bilaterally, but the specific angle degrees were not noted (Ex. 31F, pg. 15). [Endsley]'s symptoms were noted to be consistent with a back sprain and physical therapy was recommended in addition to the use of prescription medications (Ex. 31F, pg. 15).

On December 13, 2021, [Endsley] had another office visit with her orthopedist and reported chronic bilateral knee pain (Ex. 31F, pg. 7). She denied locking or giving out of her knees (Ex. 31F, pg. 7). [Endsley] reported that her "knees were shot" and stated that her prior treating doctor advised her that she could undergo surgery on her knees. The orthopedist noted [Endsley] could not recall what diagnoses she was previously given or what type of surgery she was advised to undergo (Ex. 31F, pg. 7). The orthopedist noted [Endsley] was a poor historian (Ex. 31F, pg. 7). In the review of symptoms, [Endsley] reported having arthralgias and myalgias. She denied having neurological symptoms, gastrointestinal symptoms, or respiratory symptoms, including sleep apnea (Ex. 31F, pg. 7). She also denied having depression, anxiety, psychiatric symptoms, or emotional problems or concerns (Ex. 31F, pg. 7).

On physical examination, [Endsley] was noted to have full, 5/5 strength in her bilateral knees, bilateral ankles, and both great toes, and she had full range of motion in her bilateral knees and ankles (Ex. 31F, pg. 7). [Endsley] was also noted to have normal respiratory signs (Ex. 31F, pg. 7). Additionally, she was noted to be oriented to person, place, and time; her memory was normal; and she had appropriate mood and affect (Ex. 31F, pg. 7). Imaging of [Endsley]'s knees was noted to show mild bilateral osteoarthritis (Ex. 31F, pg. 8). [Endsley] was encouraged to participate in physical therapy and return in three weeks for an evaluation (Ex. 31F, pg. 8).

Notably, subsequent treatment records include several normal physical findings (Exs. 27F, 39F). For example, during an office visit with her primary care physician at Celebration Family Care in February 2022, [Endsley] was noted to have normal tone and muscle strength, normal movements of all extremities, grossly intact sensation, and she had a normal gait and station (Ex. 27F, pg. 6).

At Home Healthcare of Middle Tennessee records show [Endsley] had assistance in personal care, household tasks, and grocery shopping on five days in March 2023, eight days in April 2023, and nine days in May 2023 (Ex. 37F). However, the medical evidence does not indicate that [Endsley] requires ongoing

27

prescribed at-home care by an outside provider due to her physical or mental impairments (Exs. 27F, 32F, 37F, 39F).

On May 30, 2023, [Endsley] was evaluated by a rheumatologist for her reported joint pain (Ex. 39F). A physical examination showed several normal results including [Endsley]'s normal gait without use of an assistive device; normal sensation except for decreased sensation of the fingers; no synovitis of the wrists; trace osteoarthritis of the hands and feet; no effusion of the knees or shoulders, and stable rotation of the hips (Ex. 39F, pg. 5). The physical examination also showed normal signs of [Endsley]'s skin, eyes, ears, neck, abdomen, and normal cardiovascular and respiratory signs (Ex. 39F, pg. 5). In addition, [Endsley] was noted to be oriented to person, place, and time; she had a normal affect; and she had normal memory (Ex. 39F, pg. 5). The rheumatologist assessed primary generalized osteoarthritis (Ex. 39F, pg. 5). Treatment records also note prior laboratory work that was reviewed and showed negative rheumatoid factor results and negative ANA results (Ex. 39F, pg. 5). A CCP antibody test was also reviewed and noted to show negative results (Ex. 39F, pg. 5). In addition, x-rays of [Endsley]'s lumbar spine was reviewed and noted to show lumbar dextroscoliosis (Ex. 39F, pg. 5). X-rays of [Endsley]'s bilateral knees and hands were also reviewed and noted to show negative results (Ex. 39F, pg. 5). The rheumatologist encouraged [Endsley] to have hydration, a balanced diet, range of motion exercises daily, and pacing activity with rest (Ex. 39F, pg. 6).

The evidence also shows [Endsley] was obese during the period in question. For instance, on March 28, 2021, [Endsley]'s weight was documented as 186 pounds at a height of 63 inches (Ex. 24F, pg. 7). At this weight and height, [Endsley] had a body mass index (BMI) of 32.9. BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m2). The Clinical Guidelines issued by The National Institutes of Health defines obesity as present in general where there is a BMI of 30.0 or above. [Endsley] did not testify to any functional problems associated with her weight. Moreover, in her testimony, [Endsley] indicated that she is no longer obese. At the June 2023 hearing, [Endsley] testified that she currently weighs 135 pounds at a height of 5 feet, 3 inches. At this stated weight and height, [Endsley] has a current BMI of 23.9. The undersigned concludes that, given the nature of [Endsley]'s physical impairments, her obesity would have been an aggravating factor with respect to her other impairments and the symptoms from them (SSR 19-2p). However, her obesity, in addition to her other physical impairments, has not precluded her from work at the light exertional level since August 28, 2019.

\*     \*     \*

As for the remaining medical opinions, on March 18, 2021, consultative examiner, Dr. Wilson opined [Endsley] can sit for four to six hours in an eight-hour workday, and she can stand and walk two to fours hours each. Dr. Wilson also noted that [Endsley] used a cane to help with ambulation due to her left ankle impairment. Additionally, he noted [Endsley]'s report that she thinks she can lift up to 20 pounds

occasionally (Ex. 24F). The undersigned finds Dr. Wilson's opinion is not persuasive because it is clearly based on [Endsley]'s self-reports including her report that she "thinks she can lift up to 20 pounds occasionally" (Ex. 24F, pg. 9). Additionally, Dr. Wilson's opined ranges of time of [Endsley]'s ability to sit, stand, and walk are vague and not adequately specific to allow for vocational consideration.

(AR 31–38.)

Endsley argues that certain "clinical findings" in the record regarding her knees, kidneys, left foot, and back "are inconsistent with the [ALJ's] determination that [ ] Endsley could perform the exertional requirements of light work." (Doc. No. 10-1, PageID# 2740.) Specifically, Endsley argues that:

- Dr. Davidson's treatment notes from August 2019 show that Endsley had "significant issues in" both knees (Doc. No. 10-1, PageID# 2739 (citing AR 1854–58));

- "the record does not indicate any improvement in [ ] Endsley's kidney failure since the March 2017 testing" (*id.* at PageID# 2740 (citing AR 737));

- Dr. Davidson's treatment notes from April 2020 summarize x-rays showing a small posterior heel spur, small metallic foreign body plantar aspect first web space, and mild degenerative changes midfoot, and state that Dr. Davidson recommended Endsley undergo elective surgery to remove the hardware (*id.* (citing AR 2035, 2042);

- a March 18, 2021 x-ray of Endsley's lumbar spine taken in connection with Dr. Wilson's consultative examination showed multilevel degenerative lumbar spine changes without acute abnormality (*id.* (citing AR 1968)); and

- Dr. Wilson's notes from the March 17, 2021 consultative examination state that Endsley was using a cane (*id.*).

Endsley argues that "[t]his evidence . . . causes additional limitations in her ability to sit, stand, and walk, and the ALJ cherrypick[ed] the record to support his determination [of Endsley's RFC] in error." (*Id.*)

As a threshold matter, the Court has already found that Endsley did not identify kidney disease as a basis for her DIB and SSI claims and did not testify that she experienced any symptoms

of kidney disease. Endsley's cursory argument that the ALJ should have included exertional limitations related to her kidney disease in her RFC for this period is therefore not a basis for remand.

Endsley is correct that, generally speaking, ALJs may not pick and choose evidence that supports their conclusions while ignoring evidence that undermines their conclusions. *See Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where ALJ "cherry-picked select portions of the medical record" rather than doing a proper analysis). However, arguments that an ALJ cherry-picked record evidence are "seldom successful because crediting [them] would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014).

Here, there is "little indication that the ALJ improperly cherry[-]picked evidence" regarding Endsley's knee, ankle, and back. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). The ALJ considered and discussed record evidence documenting Endsley's "degenerative arthritis of her bilateral knees" including Dr. Davidson's August 2019 treatment notes and MRI results from the same period. (AR 33.) And the ALJ considered Endsley's testimony about her arthritis and knee pain. (AR 31.) However, the ALJ also considered record evidence that Endsley's "joint pain was generally controlled with the use of gabapentin and 800 mg ibuprofen" (AR 33 (citing AR 1848–69, 1975–2053)) and that "several subsequent physical examinations note[d] [Endsley's] normal ambulation, gait, and station, which support a finding that [Endsley] did not require continued use of a cane" (*id.* (citing AR 2054–2105, 2349–2568, 2584–2595)).

Endsley points to record evidence that, in April 2020, Dr. Davidson reviewed x-rays of Endsley's foot and ankle showing a small posterior heel spur and broken hardware from a prior

ankle surgery and Davidson recommended surgery to remove the hardware. (Doc. No. 10-1 (citing AR 2035, 2042).) The ALJ expressly considered the evidence that Endsley "underwent another surgery on her left ankle for removal of [the] hardware" "[o]n June 29, 2020," that she "required use of a walking boot after the surgery[,]" and that "[t]reatment notes by [her] orthopedist dated September 16, 2020, show [she] was no longer wearing the boot due to her improvement." (AR 33 (citing AR 2021, 2025, 2027).)

Endsley also points to evidence from Dr. Wilson's March 17, 2021 consultative examination, including Dr. Wilson's notes regarding her use of a cane and a subsequent x-ray of her lumbar spine. (Doc. No. 10-1.) The ALJ considered the x-ray, finding that it "showed multilevel degenerative lumbar spine changes and facet changes without acute abnormality." (AR 35 (citing AR 1968).) Dr. Wilson's examination notes state that Endsley "ha[d] a cane with her in the room [ ] but was able to ambulate without the cane. She did use the cane to push herself up out of the chair." (AR 1972.) Dr. Wilson's notes also state that Endsley told him "[s]he ha[d] been using a cane since last year because of ankle pain[,]" and Dr. Wilson opined that Endsley was "using a cane to help with ambulation because of her left ankle." (AR 1971, 1973.) The ALJ considered this evidence, finding that Endsley "had a cane with her but was able to ambulate without its use; and she did use the cane to push herself up from a chair." (AR 35 (citing AR 1972).)

Endsley argues generally that this evidence "causes additional limitations in her ability to sit, stand, and walk," (Doc. No. 10-1, PageID# 2740), but she has not identified any specific errors in the ALJ's analysis of this evidence. The ALJ's written decision shows that the ALJ reviewed and considered the evidence that Endsley argues support finding additional exertional limitations but reached a different conclusion. Where the evidence can support both the ALJ and Endsley's

position, the ALJ's decision is not subject to reversal. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."); *see also Incorvia v. Comm'r of Soc. Sec.*, Case No. 1:22-CV-01911, 2023 WL 6519152, at *9 (N.D. Ohio Sept. 20, 2023) ("As support for finding this impairment severe, [the claimant] merely presents the same evidence the ALJ discussed and requests that this Court reach a different outcome—an impermissible request to reweigh the evidence."), *report and recommendation adopted*, 2023 WL 6519082 (N.D. Ohio Oct. 5, 2023); *Blakley*, 581 F.3d at 406 (stating that "'there is a zone of choice within which the decisionmakers can go either way, without interference by the courts'" (quoting *Mullen*, 800 F.2d at 545)). Substantial evidence supports the ALJ's determination of Endsley's RFC for the period after August 28, 2019.

Endsley's final argument is that "the ALJ did not give any indication that [the ALJ] considered whether exertional limitations based on [ ] Endsley's fatigue or pain would be appropriate." (Doc. No. 10-1, PageID# 2740.)

SSA regulations require an ALJ determining disability to "consider all [of the claimant's] symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a), 416.929(a). A two-step evaluation process governs this analysis. SSR 16-3p, 2016 WL 1119029, at *2–4 (Mar. 16, 2016). First, the ALJ determines "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms . . . ." *Id.* at 2; 20 C.F.R. §§ 404.1529(b), 416.929(b). If the ALJ finds that such an impairment exists, he must then "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the claimant's] ability to perform

work-related activities . . . ." SSR 16-3p, 2016 WL 1119029, at *2; 20 C.F.R. §§ 404.1529(c), 416.929(c). Regulatory factors relevant to evaluating the intensity, persistence, and limiting effects of an individual's symptoms include daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; any measures used to relieve the symptoms; and other factors concerning the claimant's functional limitations and restrictions due to those symptoms. SSR 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. §§ 404.1529(c)(3)(i)–(vii), 416.929(c)(3)(i)–(vii).

The SSA has issued additional guidance for ALJs evaluating disability claims based on fibromyalgia. *See* SSR 12-2p, 2012 WL 3104869, *1 (July 25, 2012). "Fibromyalgia . . . is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.3 (6th Cir. 2007) (quoting *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005)). The Sixth Circuit has held "that fibromyalgia can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Id.* at 243 (footnote omitted). For example, "fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have a full range of motion.'" *Id.* at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). Consequently, "[t]he process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." *Id.*

The SSA recognizes that "[w]idespread pain and other symptoms associated with [fibromyalgia], such as fatigue, may result in exertional limitations that prevent a person from

doing the full range of unskilled work in one or more of the exertional categories" that the SSA uses to determine individuals' RFCs. SSR 12-2p, 2012 WL 3104869, at *6; *see also id.* at *3 (recognizing that fibromyalgia "symptoms, signs, [and] co-occurring conditions" include "manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, [and] irritable bowel syndrome" (footnotes omitted)).

At the administrative hearings, Endsley testified about pain in her ankles, knees, and back and about burning sensations in her back and feet. (AR 60–62, 99–100, 102, 108–09.) Endsley primarily attributed the ankle pain to her broken ankle and subsequent surgeries and attributed the knee pain to her arthritis. She did not identify the cause of the burning sensation in her back and feet. Endsley also testified that she "get[s] very tired" walking (AR 99) and feels like she is "recovering from the flu or something all the time" (AR 67).

The ALJ found that fibromyalgia was one of Endsley's severe impairments during the closed period of disability and continued to be a severe impairment during the time period beginning on August 28, 2019. (AR 27, 29.) The record also shows that the ALJ considered Endsley's testimony about her pain and fatigue:

> At the March 2022 hearing, [Endsley] testified that she fell and broke her ankle at her grandson's football game. She stated that she underwent a total of three surgeries on her ankle. She also stated that she continues to have pain in her ankle, and she falls. [Endsley] testified that her ankle pain is aggravated by the weather and her activity. She further testified that she has arthritis and knee pain, especially in her right knee. . . . She stated that she experiences back pain, and she was scheduled to undergo injections in her back and knees but she lost her insurance a year ago. She also stated that she needs to undergo knee replacements. [Endsley] testified that she takes fluid pills, and she uses Tylenol and ibuprofen frequently. She stated that she tried different prescription medications to treat her arthritis, but they did not help. . . . [Endsley] testified that she recently began having numbness in her arms to the tips of her fingers, and her fingers swell. She stated that she is only able to stand for 15 minutes at a time and is only able to walk for 20 to 25 minutes at a time. . . .
>
> At the June 2023 hearing, [Endsley] testified that her left foot gets weak, shaky, and drags. She also testified that she has a burning sensation on the bottom of both

34

her feet. [Endsley] stated that she falls two to three times a week and sometimes falls two to three times a day. She also stated that she avoids being around others because it is embarrassing to fall. The claimant testified that she uses a cane on some days depending on how she feels and on the weather. She stated that she uses her cane approximately 20 to 25 days a month, and her insurance paid for her cane. . . . [Endsley] testified that her doctor advised her to walk for five minutes, but she gets dizzy and her oxygen level gets low when she attempts to walk. She stated that it is difficult for her to walk five minutes, and she has problems sitting because her back burns. She further testified that she is not able to sit through an entire meal and must stretch and bend. . . . She stated that she feels like she is recovering from the flu all the time, and she sometimes feels dizzy and lightheaded during the day even after use of her nebulizer. She indicated that she must lie down during the day for a few minutes at a time.

(AR 31–32.) The ALJ found that,

> considering the evidence of record, . . . [Endsley]'s medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, [Endsley's] statement concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . .

(AR 32.) The ALJ specifically addressed record evidence regarding Endsley's fibromyalgia, finding that:

> treatment records document [Endsley]'s history of fibromyalgia (Exs. 16F, 19F, 22F, 26F–27F). However, the medical evidence shows [Endsley] has not had ongoing treatment with a rheumatologist for symptoms of fibromyalgia during the period in question. Additionally, medical records indicate [Endsley's] symptoms of fibromyalgia were generally controlled with the use of gabapentin (Exs. 21F, 25F–26F).

(AR 33.)

Endsley argues that the ALJ "fail[ed] to discuss whether exertional limitations based on [ ] Endsley's pain would be appropriate" and therefore "did not properly apply SSR 12-2p to [ ] Endsley'[s] claim[s]." (Doc. No. 10-1, PageID# 2741.) Specifically, Endsley argues that "SSR 12-2p requires ALJs to give special attention to pain and fatigue related limitations when the claimant suffers from fibromyalgia," and that her fibromyalgia "is well-documented in the record." (*Id.* (citing AR 1982, 1994, 2029, 2035, 2057, 2068).) The administrative record pages that Endsley

cites mention her fibromyalgia diagnosis, but they do not address her fibromyalgia symptoms. (AR 1982, 1994, 2029, 2035, 2057, 2068.) And, contrary to Endsley's argument, the record shows that the ALJ did consider and address Endsley's testimony about her pain and fatigue. Endsley has not shown that the ALJ's analysis fails to comply with SSA regulations or lacks the support of substantial record evidence. She therefore has not shown that remand is warranted on this record.

## IV.     Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Endsley's motion for judgment on the administrative record (Doc. No. 10) be DENIED and that the Commissioner's decision be AFFIRMED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 15th day of August, 2025.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge